We move the court for a reversal of the decision in Katsouros 2, made by the board reversing the hearing officer's decision to finding discrimination in Katsouros 2. The foundation document for the appellant's brief is the decision of the hearing officer in Katsouros 1 and Katsouros 2, as joined by the order of the board, a previous order of the board, pursuant to the interrelationship of the two cases and pursuant to the fact that Mr. Katsouros was the plaintiff-complainant in both cases. In reading the foundation document as we refer to it, it can be noted that with respect to Katsouros 1, which was affirmed by the board and which was now acceded to by respondent AOC by virtue of its withdrawing its 14-6002 appeal, a companion case in this matter, as conceded, a close reading of it will show that the hearing officer kind of developed or looked at the facts in the matter and developed or established somewhat of a paradigm for both cases, in which he said that what was important was notification that the complainant had an ADA-qualified disability, that there was notification that they were suffering from a new episode of the bipolar disability and the mental impairment that was associated with the bipolar disability, that there was a nexus between the bipolar disorder and impairment of thinking resulting from, and that there was a triggering effect to implement 42 U.S. Code 12-112B-5 of the ADA. That was what the hearing officer based his finding in Katsouros 1 on, which was affirmed again and was acceded to by the respondent AOC. In Katsouros 2, the hearing officer somewhat replicated the same paradigm that he used in Katsouros 1, in effect saying that they had knowledge of the fact that he had a bipolar disorder with a mental impairment of thinking, that the AOC was aware of the new episode by virtue of the late testimony of Wally Reed, which was accepted by respondent AOC and by the respondent board in affirming Katsouros 1, the late person's testimony that Mr. Katsouros was in a breakdown and was mentally dysfunctional. There was a nexus between them, which is again identified by the hearing officer within this foundation document of his decision, showing that the AOC was aware that there was a correlation between his disorder, his mental impairment, and his absences, which were the cause of his problems in terms of attendance, and that there was this, again, triggering event, which was the request for accommodation at the time of the termination hearing, the Chapter 72 termination hearing, whereby his personal representative at that time requested a postponement because he was impaired in terms of thinking and mentally dysfunctional. Mr. Leib? Yes, sir. Did you have your brief that you wrote, the blue brief? Yes, sir. On page 13 in your bullet there, 21? Yes, sir. You say to us that your client hadn't been released to return to duty as of January 28th? I was incorrect in writing that, Your Honor. Well, I understand that. At several other places in your brief, you suggest that there had been no release to return to duty. I was incorrect at all times. There was a release to return to duty. I'm trying to draw your attention to that. That's at A298 in your brief, which is Dr. Pope's letter dated January 9th, said that he's able to return to employment. And I didn't see that you came to grips at all with that statement by Dr. Pope in your briefs. I did not, and I was incorrect in not addressing that. If I might That would be considered the elephant in the room, whereas not because of the fact that according to the case law... Well, why don't we take it one step at a time. If you look at the decision by the full board, the one that you complained to, the board is saying this is on page 6 of the board's decision. There's no evidence in the record. This is with regard to Katsuro's 2. There's no document of any medical disability that would have prevented him from complying with leave procedures. It seemed to me that that statement, no medical disability would have prevented him from relying on Dr. Pope's January 9th letter. If I might address both of your issues and this issue of the attendance. I find it difficult to correlate, to rectify the absence of FMLA issues with the discussions in both respondents' briefs with FMLA issues and FMLA regulations brought up about what can and cannot be done and what must be done in terms of complying by an employee with FMLA regulations. But aren't we talking about an ADA problem with regard to the May termination hearing? Yes, sir, but I... Isn't that really what's at stake in this appeal? If I may talk to these issues, the issue is whether or not, I think the paramount issue is whether or not, irrespective of the attendance issue and irrespective of the medical issue, is when the respondent AOC having a history of knowledge of the disorder, having a history of knowledge of the serious medical condition, must stop the hearing and then engage in the interactive process. Now that interactive process is determined by the fact that he is told by the lay person witness that Mr. Katsouris is mentally dysfunctional at this time. The courts have said that even if a plaintiff was not complying with the requirements of attendance, the court, meaning the hearing officer and or the board, must still determine whether it is uncontested that plaintiff's absence could have been reasonably accommodated. Those absences could have been reasonably accommodated had there been a postponement and had they engaged in an interactive process. And I would cite Vera V. Williams Hospitality Group, Inc. Can I point to one other thing that troubled me in the record that I don't think you addressed in your brief? If you look at page 34 of the joint appendix... This is the hearing officer's decision? Yes, sir. And in the second full paragraph on that page, there's a finding of fact by the hearing officer that your client didn't offer through testimony or medical evidence an accommodation that would have allowed him to overcome the problem? That seemed to me to sort of be the second elephant in the room. In the absence of such a showing, it seems to me that you can't even get an ADA claim going. I would respectively disagree with the court by saying that... With the court or with his fact finding? With his fact finding, necessarily, and with your interpretation of the fact finding. The investigative and interactive process starts under 42 U.S.C. 12.1.12 when the request is made. Now, if he makes a request to, say, postpone the hearing, and that request is necessarily rejected, not outright, but rejected by default because they proceed with the hearing, then something must be done and there has to necessarily be discussed what other type of an accommodation can be made. It's just simply not disregarded and not continue with the hearing and then everything that flows from the hearing. That is why the attendance issue is necessarily irrelevant when it comes to the factor of whether or not something, there was a... I can't think of the word, I apologize. Whether or not there was an interactive process ended into. That's what the hearing officer found. The board relies on, does not dispute necessarily what the hearing officer finds. The board adds these other two factors saying that he never complied with the attendance policies and never provided a medical record and never requested reasonable accommodation or modification of it. But he's not given that opportunity because the door is shut by the fact that, yes, we're going to go on with the hearing. They had the knowledge of it going right up to the termination date and did not get involved in the interactive process. Then they had the knowledge by the WH-380, the last one of June 2008, which was consistent with the first one of September 2006. The fact that at the hearing something is not necessarily put on the table that at that moment is reasonable or unreasonable in terms of a postponing of the hearing is not necessarily the issue. The issue is what do you do when somebody makes that claim having knowledge of the prior history? This is not a tabula rosa in terms of mysticosaurus. There's a history. Mr. Lieb, you're well into your rebuttal time. Do you want to save the half minute? We'll go from the other side. And you're representing which one? The Office of the Architect of the Capitol, Your Honor. Good morning, Your Honors, and may it please the Court, Imran Zaidi for your co-respondent, the Office of the Architect of the Capitol, the employer in this matter. And Your Honors, just to be clear at the outset, we'll be splitting our time. We've taken eight minutes and we're splitting the remaining seven minutes will be for the Office of Compliance. Can you address the question of the non-postponement of the May 2008 hearing, which I don't recall there being much, if anything, said in your brief about? Well, yes, Your Honor. There's actually not much, if anything, in the record either to suggest that that request was made and what the nature of that request was. It's unclear from petitioner's arguments whether they were lodging an ADA claim with respect to the termination based on a postponement of the hearing or based on the actual termination itself. It's entirely unclear. Well, let's assume both. If both, Your Honor, petitioner would need to demonstrate, if there was a request, then that would have engaged in some duty on the part of the Office of the Architect to figure out whether he could be accommodated as with the first ADA claim with the suspension in November, December of 2007. But he would still need to, at some point, have identified a reasonable accommodation that would have enabled him to participate or to work. At any point, that is an independent... A reasonable accommodation that would have allowed him to do his job or a reasonable accommodation that would have allowed him to participate in the hearing? Well, it depends, of course, on which one of the violations... But just talk about the hearing. As to the hearing itself, and I suppose similar to the hearing in December of 2007, it would be a reasonable accommodation that could allow him to participate in the hearing. But in order to... So you are accepting the proposition that the ADA requirements apply to the hearing holding, which I think there's at least some discussion in some judicial opinions about whether that is the case. That's true, Your Honor, and that was, of course, the basis of the ADA violation found by the Office of Compliance with respect to the suspension in December of 2007, that he was not accommodated in that capacity allowing him to participate in the hearing. Okay, but... But that hearing, but that request was supported by evidence. In this case, the relevant period for the termination is effectively May of 2007 all the way up until June of 2008, at which point his termination was finalized. And the last six months of that period, which is when he would have returned from his 10-day suspension all the way until June of 2008, there is no evidence to suggest, no medical evidence or otherwise, to suggest that he was in any way incapacitated or unable to work. So the last doctor's note that we have is the one January 9th, 2008, saying that he's ready to return to work? No, Your Honor, there is also a doctor's note from June of 2008, but that note simply says that in June of 2007 his condition started and that at that specific time he was able to work, in June of 2008. Do you rely at all on the January 9th letter? Pardon me, Your Honor? Do you rely at all, put any reliance on the January 9th letter from Dr. Pope? We absolutely do, Your Honor. We rely on that for the proposition that when he was supposed to return, when he was supposed to attend work starting in January of 2008, he was able to medically, and that's the last evidence that the architect had. Do you treat this as sort of in essence resetting the ADA clock? We certainly do, Your Honor, we do. So you would say that after you treat the January 9th letter as a clean bill of health, meaning he can come back to work, he no longer has an ADA-compliant disability, he has to come in and show he has one and then make a request for accommodation? That's correct, and that's because the actual duty to accommodate must be triggered by a request, and now this isn't a sort of formalistic requirement, it doesn't require any certain incantation of magic words, but it does at bare bones require that an employee identify that he has a disability and that he desires an accommodation. He had a pending request for accommodation from December 12th, right, Mr. Wallace reads? I believe you mean December 12th. December 12th, right. Yes. But your view would be that that too is sort of wiped clean by the January 9th letter from Dr. Pope? That's exactly right, Your Honor. Our position is that even if there had been a prior indication of disability, which we do not dispute that there was. Let me come back and let's turn to the letter of January 9th, age 298 in the record. Yes. It says that, now we know that about a month earlier, the same doctor had sent in a medical declaration saying this person has bipolar disorder, he's really not in very good condition at all, his medication isn't working effectively, we need to work on the medication, he couldn't possibly return to work, right? And then we have less than a month later this letter from Dr. Pope, right? Correct. Now this letter wasn't at all discussed in the board decision, nor was it even recognized by the hearing examiner, right? Your Honor, it was referenced in the board decision, and I can pull that up if you want. What was referenced is that he showed up to work on January 14th, 2008, apparently able to work. I do not recall if it explicitly mentioned the actual medical declaration. I don't believe it's in the letter. This is on page 6 of the joint appendix. It reads, under the ADA violation, there's the second full paragraph under the ADA violation, there's no record evidence that Katsouris made a request for leave or followed the OLC's leave procedures during his absence. The evidence showed that Katsouris returned to the office on January 14th, presumably ready to work after having been out on leave since November 2008. No, it doesn't even refer to the doctor. So it doesn't explicitly refer to the doctor. Let's go back to the doctor's letter. Yes, the January 9th letter. January 9th says he is able to return to customary employment. Customary employment, could it not be interpreted to mean the employment that he was enjoying before he left and to which he's going to return? It could, Your Honor, but what would that be in this case? And that would have been ADA-disabled employment, subject to a pending request for accommodation. Well, no, Your Honor. This is where it's important to clarify that his ADA request, as to his suspension hearing in December 2007, the request for an accommodation was not to enable him to return to work. It was for the sole purpose of allowing him to participate in that hearing. And this is why we are trying to very clearly— What I'm wondering is why that particular request for accommodation doesn't apply to May if what the doctor was saying is you can go back to work in your customary employment. That is to say you can go back as a person who has bipolar disorder that may be managed okay now under medication, but you are still disabled. Correct. Well, to be clear, he had been disabled, Your Honor, and the office was aware of that from even a year earlier. But at no point during that period had he submitted that he was actually incapacitated based on it. But to your point, in December of 2007, the Office of the Architect receives the first request saying that for three months he will be incapacitated. And then in January, he's medically cleared. And I believe your point, Your Honor, is that it says customary employment at that point. And so you're sort of reading the two medical certifications together to say customary employment might be whatever was requested in that first medical certification in December. And our point is simply that that certification was solely to allow him to participate in a disciplinary hearing. And the reason we make not to return to work... Which certification, Lee? This is the December... The 9th? The date of the certification, I believe, is November 28, 2007, and this is on pages... I'm missing something on the certification. This is on page 58 to 61 of the Joint Appendix. The medical certification that is dated November 28, 2007. It says, and this is on page 61, currently not capable, may be capable in, say, three months. Of what? It literally says currently not capable. There's nothing more. So at that point, this is December. This had been submitted in December of 2007, but it was dated November 28, 2007. Our intention is that once the medical clearance in January, saying that he was fully able to return to work, was submitted, at that point he would have needed to submit a new request for accommodation, that they cannot be read together to suggest that, you know, the new medical clearance still incorporates this by reference, so the office has an ongoing duty to accommodate him. He still must, under the law, request a separate accommodation. Again, not a formalistic request, but at least indicate the desire for an accommodation, not to not even make contact with the office. Your point is that from the time that he returned to work and was told to go home because he'd been suspended, and then he did not show up for work at the end of the suspension period and was essentially radio silenced until a representative at the hearing complained and, in essence, said he should be here? Correct. There's nothing in that ensuing time period that asked for any kind of accommodation? From him, Your Honor? Is that what you're suggesting? There's nothing in that time period from when he could have returned to work till the event at the hearing where his representative looked to me and complained that he wasn't there. There was no request for any kind of accommodation. That's exactly right, Your Honor. Whatever customary employment could mean, it couldn't possibly mean not showing up to work at all for several months. No, Your Honor, for a year at that point. But we're talking from January to June. Correct, but the basis of the termination in 2008 was actually leave and the failure to follow leave policies and, quite frankly, the absence from work for a year at that point because starting in May of 2007 all the way up until June of 2008, he simply did not show up for work. And if nothing else, this case stands for the proposition that you cannot not show up for work for a year and have any kind of rights claimed unless you have some medical evidence to suggest that there was a reason for that. And I would just point you, Your Honor, to page 287 to 97 of the Joint Appendix, which details on a daily basis his failure to comply with the leave policies during that stretch. We should hear from Mr. Allman. Can I ask one question? I asked Mr. Leib what I should make of page 834 in the record of the finding by the hearing officer. I'm sorry, Your Honor, what page? Page 834 in the record. Yes. Page 18 of the hearing officer's decision. I asked what I should make of the second full paragraph, complainant did not offer at the hearing. On the left side? No, on the fact finding. It's on page 34 in the record. The second full paragraph, complainant did not offer at the hearing. Correct, Your Honor. Any evidence? Yes. What you're supposed to make of this, Your Honor, and this is why we have two separate arguments as to the ADA claim, which is that even if the office of the architect had a duty to engage in the interactive process, this establishes, and we submit that there is no evidence of a reasonable accommodation that would have allowed him to work, and that is a standalone requirement to establish an ADA violation. What about to appear at the hearing? For the complainant? It looked to me like the rubber that hit the road on the ADA claim was basically his argument that he should have been given an extension to appear at the hearing. Correct, Your Honor. And just two sentences, what's wrong with that? His argument is that the agency knew all along that he is impaired under the act with a disease that is continuing to impair, and so he's saying to himself, even though I was not there, you're trying to terminate me, I'm entitled to be at my hearing. Right. He said, knowing what you knew about my condition and knowing what you knew about my at least previous request for accommodation, you should have accommodated me and given me an extended hearing date. What's wrong with that? Your Honor, what's wrong with that, and the very clear distinction between this termination hearing and the prior suspension hearing, is that there is absolutely no medical evidence that covers that period and suggests that he was not, in fact, able to attend that hearing. And that's not only through these agency proceedings that we're looking at right now, but through the actual claim filed with the Office of Compliance that at any point since then, there has been nothing turned up through discovery to suggest that he was unable to attend that hearing. And courts have made very clear the case that we cite in reference to the ADA claims, Wills versus Canopolis. Nothing to be gained from the fact that the agency knew that he was incapable or unable to come back to work? Seven months prior, Your Honor. Well, he was unable to come back to work after the end of the 10-day suspension. He did not? You would think somebody who showed up once his doctor said it's okay if you come to work even though you're still impaired and you're medicated, okay, he comes, I'm ready, willing to work, and said, no, no, no, you're suspended, go home. Now, he doesn't come back in 10 days. Isn't there an inference that there's something wrong with him? Your Honor, again, the agency... He indicated his willingness to come to work by coming and being told to go home. No, he certainly did. In fact, we would submit that it's hard to who to impute that failure to come back to afterwards. If the agency told him he had been suspended for 10 days, he was able to come back at that point, it would seem even more likely that he should be able to come back after that or, if not, to submit a request to the agency. And no, we don't believe that there's an inference that can be made at that point. There does need to be a request to trigger the duty for an interactive process. If there are no further questions, we ask that the Court deny this petition. Thank you, Mr. Willman. Olman. May it please the Court, I'm John Olman. I'm representing the Respondent Office of Compliance. I wanted to address one of the questions that seems to be troubling the Court, and that is about the termination hearing. And what you will see from the... And we struggled to figure out if there's any information at all in the record about that postponement request. And Mr. Lee didn't cite anything, and so we looked at the record, and it's at 430. It's a joint appendix. It's at page 434 and 435. And there isn't very much in there. There's a suggestion. I think the question, the leading question was asked. This is on the day of the hearing. It appears to. Not in advance. Well, again, we actually don't know. This is a transcript from the OOC hearing. Who's the person who said yes in the answer to the question on 434? She was a human resource person from the AOC. Okay. So a speech for the Office of Compliance. Well, we speak for the office. Somebody, Mr. Lieber, somebody saying, did it come to your attention that a request for an extension had been made? Yep. So a letter would have been delivered to the office, and I would have given it to employee relations. So the suggestion that there was actually a written request for an extension. Right. But there is nothing in the record about a written request. And there's nothing in the record saying... Well, there's this. Well, there is that, but there's nothing saying why the request was made, when it was made, why it was made. I mean, there's... The basis for the request. Or the basis for the request. I mean, the record is just devoid of sufficient information to say that it was a denial of a reasonable request for accommodation with respect to the postponement. The only thing there is, that information... There's your argument here that the burden would have been on Mr. Katsuros to come forward with a letter saying, yes, I requested an extension of the hearing date, because as you all know, I have an ADA disability, and I'm not able to get to this one. That's correct. I mean, he has the burden of production and persuasion on an ADA claim. So he would have to come forth with the evidence to demonstrate that. And unlike the suspension claim, where that evidence is very clear, there is no evidence there. Yeah. So the board really had no choice but to ignore that claim. I mean, there just wasn't enough evidence there to even entertain it. For the board, I think this is simply a choice between, is this a reasonable accommodation claim or an absenteeism claim? And the accommodation that I think that Mr. Lee was talking about is not really a request for medical leave. It's a request that the employee be allowed to not show up at work without notifying an employer for extended periods of time without indicating how long you're going to be gone, or if or when you're going to return. I mean, if you're going to characterize what this request was. Let me ask the Office of Compliance a question on relief here. Let's assume for purposes of argument we disagreed with you and we thought there was an ADA violation with respect to the termination hearing, namely the failure to grant an accommodation for a delayed hearing date. The relief that would have been imposed here by the hearing officer for that violation was a reinstatement with a back pay going back to a June date, not just the opportunity for an actual hearing. Yet with regard to the remedy on the suspension hearing issue on the ADA violation, the recommendation by the ALJ, the hearing officer, was either granting a hearing or reinstating. Now, if we were to decide here that there was an ADA violation, would you be arguing that there should be a remand for the board to consider what the proper remedy is? Well, I think ultimately there should not be, because I think ultimately Mr. Katsouris has to show that there would have been a difference. If there had been a postponement, that the... Well, but I mean if there's an ADA violation, at the least he gets a hearing, right? I mean, for us to say it's harmless error to have denied him the hearing because he would have lost anyhow seems a little silly. I mean, that's like taking away a due process. That's right. Well, I mean... What I'm trying to say is I didn't see anything in your brief saying, for example, whoa, whoops, if we disagree, there's an ongoing penalty issue that has to be here. The board didn't address the penalty on the termination hearing issue, right? Correct. Is it your view that the board should have an opportunity to address that? Well, certainly. If you were going to remand it, I think you would remand it to the board to determine what would be the proper course of action. I mean, there is the question whether it's worthwhile to have a hearing in which there isn't really another possible result here. I mean, the question is not whether the employee was properly terminated. The question was whether he was violated, whether he was discriminated against because of his disability with respect to his termination. And, I mean, if the result of a termination, an administrative hearing, is going to be... Well, does he get to raise reprisal in that hearing? I mean, if his argument is, well, you know, you terminated me, but the reason why you terminated me is because I'm disabled. If he can establish that, he's going to win, right? Even though he was absent for a long period of time. Well, I don't believe he's going to win unless he can show he could perform the essential functions of the job. I mean, if he was fired because he didn't show up at work and didn't contact his employer and didn't use the leave procedure, which is what the 88 cases... I mean, there is no 88 case that says that an employer has to grant a leave if an employee doesn't use the leave procedures and tell them that they're going to be absent, tell them how long they're going to be absent, tell them to provide medical certification that he will be able to eventually return to the job. So I think that the basis really... That was the basis for the termination. That was really what the basis of the board's decision was, is that this was not an ADA accommodation claim or case. This is a case really where somebody simply did not comply with the attendance and leave procedures, and there was no evidence indicating that he could not. There was no medical evidence indicating that he could not comply with the procedures. And ultimately, the case law, I think, is very clear that an employer doesn't have to continue an employee's employment when he cannot follow the leave procedures that are available to him. Thank you. Mr. Lieb, I think it's five minutes. Please restore the floor, Mr. Bell. Thank you. If it pleases the Court, at all times with the four WH-380s that are submitted, the FMLA WH-380s dealing with the medical certifications, at all times it's shown that he has a chronic episodic disorder. So to say that there's a cutoff date and a stop date and then a new date for an ADA reasonable accommodation is necessarily in conflict with the medical evidence in terms of the fact... I'm sorry, but why should that be so? If a chronic disorder, particularly of that sort, can flare up and die down, and on January 9th the most reasonable reading of the letter is, okay, he's ready to go to work, and then May 15th comes, and whenever the letter was requesting a postponement sometime before that, I guess the record doesn't say when before that, isn't it reasonable for them to insist that some reason be given that this is a period of flare-up? That is provided necessarily by the lay witness testimony of Wally Reed from having conversation with him and saying, I can't understand him, he's dysfunctional, for lack of a better word. But if that was accepted for the first hearing, the lay witness testimony, then that should be acceptable for the respondent AOC and the Board for the second hearing, which is... When Mr. Reed gave that testimony to which you referred, he was obviously referring to a point in time. I mean, he was referring to a point in time at which he thought Mr. Katsouros was impaired in the way he was saying, like it was past. Well, no, that point in time... He wasn't testifying that I'm swearing under oath that Mr. Katsouros will, in six months, be exactly like I saw him yesterday. No, no, he was not talking about the future at all. He was talking about from the suspension, the end of the suspension, to May the 15th, the date of the hearing. He was not talking about anything post that. And then the WH-380 is provided of June 28th, I believe it is, and submitted, which shows that he's okay now and he's over his flare-up, so to speak. That type of medical documentation. By the way, the individual whose testimony is in, that we've been referring to, is the former director of the HRMD, the Human Resources Management Division. She's the one who gave that testimony. Rebecca Tishoni is her name. Again, based on the facts that were in front of the hearing officer, the hearing officer saw a replication of the facts that were in Katsouros 1, and he submitted his decision based on that. The board, even if the facts are undisputed, provides these facts about non-compliance with attendance. However, he was in compliance with attendance in terms of the chronic, severe, serious medical condition that is in the Architects Chapter 630, that one can present a timeframe when you're capable of coming back to work, and although it was unforeseeable, his flare-up, he can provide the information covering that period of time. So he was consistent with the requirements for people who are under FMLA and, by extension, ADA, as opposed to somebody who had the flu or had a broken leg and that type of situation. So to say he was in non-compliance is an incorrect interpretation of what he did when he was in compliance and provided the WH 380 of June 28. Now, again, the stopping and starting of the clock does not inhibit or does not preclude the AOC from participating in the interactive process when it knows something. The case law says that sometimes the employer has to come forward and offer an accommodation as opposed to the employee when he's incapable of. So, and again, were he to be given another hearing on the termination, were you to rule in that manner and given another hearing on the termination, he would then be able, as the court has said, bring up a due process argument to try and mitigate the terms of the proposal to terminate, which only consists of 12 work days, not the entire, the proposal is based on his not coming back to work for two weeks and a few days after the expiration of the suspension. It's not for that entire period. Mr. Court, any other questions? No, thank you very much, Mr. Lee, and the case is submitted.